FILED

2018 FEB 13  AM 9: 45

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

A. SCOTT LOGAN,                          )
                                         )
    Plaintiff,                           )
                                         )
                                         )  Civil Action No. _____
    v.                                   )
                                         )  2:18-cv-99-FtM-29 hen
UNITED STATES OF AMERICA,                )
    by and through its Agent,            )
    The Commissioner of                  )
    Internal Revenue,                    )
                                         )
    Defendant.                           )

---

## COMPLAINT AND DEMAND FOR JURY
## TRIAL FOR REFUND OF ILLEGALLY
## ASSESSED PENALTIES AND INTEREST

---

### I. NATURE OF ACTION

As with his business, A. Scott Logan ("Mr. Logan") relied on a number of advisors for the proper tax treatment of Euro losses based on prevailing authority. Congress and the Supreme Court both confirm that penalties shall not be imposed where taxpayers rely on qualified advisors. *See* 26 U.S.C. § 6664(c)(1); *United States v. Boyle*, 469 U.S. 241, 251 (1985). The IRS ignored that reliance, disregarded prevailing authorities, and retroactively imposed penalties based on changes in the law and facts concealed from Mr. Logan.

For over 16 years, Mr. Logan tried to get an accurate answer about his 1999 tax liabilities based on the law that existed at the time. In 1998, he followed the advice of his lawyer in forming a family partnership owned by three trusts which he formed to protect his children, one of whom suffers from multiple sclerosis. In 1999, Manulife Insurance Company acquired the insurance/annuity distribution business Mr. Logan and his partner built (from 2 employees to 256). Mr. Logan reinvested two-thirds of what he and the trusts received in Manulife stock. He was interested in diversifying the balance and investigated various alternatives. Consistent with his disciplined approach in building his business, Mr. Logan sought advice from people he respected. Based on that advice, he chose to invest in Euro positions through a highly credentialed foreign currency boutique. He and his advisors were told that those positions offered both remarkable investment and tax benefits.

Mr. Logan and his advisors thoroughly investigated that proposal. Consistent with Mr. Logan's disciplined approach, he asked his traditional business law firm, family law firm, and CPA firm to independently confirm the prevailing authorities and opinions drawn by an international CPA firm and an international law firm. That reliance on those qualified firms and the then prevailing authority requires a refund of the penalties and penalty interest.

2

## II. JURISDICTION AND VENUE

1.     Original jurisdiction of this civil action is conferred on this Court by 28 U.S.C. §§ 1340 and 1346(a)(1).  The action arose under an act of Congress for internal revenue, and Defendant is the United States of America, acting by and through its agent, the Internal Revenue Service.  The civil action is for the recovery of penalties and penalty interest collected without authority. The penalties and interest remain excessive in amount.

2.     Venue properly lies in this District pursuant to 28 U.S.C. § 1402(a)(1) because plaintiff resides in this judicial district at 16281 Shenandoah Circle, Ft. Myers, Florida 33908.  Mr. Logan remains a citizen of the United States.

### 1999 Claim for Refund of Penalty and Interest

3.     Mr. Logan has satisfied the jurisdictional prerequisites of 26 U.S.C. §§ 7422(a) and 7422(h) by paying the assessed taxes, penalties, and interest for 1999 and by timely requesting refund of those penalties and interest.

4.     Mr. Logan timely filed his Form 843 for refund of penalties and penalty interest on June 13, 2017, within six months of the IRS Notice of Deficiency and Notice of Computational Adjustment.  A copy is attached as Exhibit 1.  *See* 26 U.S.C. § 6230(c) and (d).

3

5.     Mr. Logan timely filed his Form 843 claim for refund and suspension of interest on June 13, 2017, within six months of the IRS Notice of Deficiency and Notice of Computational Adjustment.  A copy is attached as Exhibit 2.  *See* 26 U.S.C. § 6230(c) and (d).[1]

6.     More than six months have passed since Mr. Logan filed his Forms 843 for 1999 without the IRS taking substantive action on them or formally disallowing them.  *See* 26 U.S.C. § 6532(a)(1).

### III. THE PARTIES

7.     Plaintiff, A. Scott Logan, as a widower, filed a Federal income tax return with a single filing status for the tax year ending December 31, 1999.  His 1999 tax return included the tax consequences of, among other things, the A. S. Logan Grantor R/I/A Trust I ("Logan Trust I"), the A. S. Logan Grantor R/I/A Trust II ("Logan Trust II"), and the A. S. Logan Grantor R/I/A Trust III ("Logan Trust III") (collectively the "Logan Trusts").  *See* 26 U.S.C. § 671.

8.     The Defendant is the United States acting by and through its agent, the Internal Revenue Service, which illegally demanded, assessed, and collected the disputed penalties and penalty interest.

---

[1] That claim is still pending administrative review by the IRS under the controlling statute.  Therefore, it is not part of this suit at this time.

## IV. **FACTUAL AND PROCEDURAL BACKGROUND**

A.    **A. Scott Logan**

9.    A. Scott Logan believes in rules and that the rule of law ought to apply equally to citizens and the government.

10.    Mr. Logan graduated from Annapolis and served as a Naval officer for more than 30 years, before retiring as a Rear Admiral.

11.    While continuing in the reserves, Mr. Logan worked in the financial and insurance industry. He co-founded Wood Logan Associates, Inc. ("WLA") in 1986 with H. Douglas Wood ("Mr. Wood"). WLA served as a sales and marketing group for North American Security Life Insurance Company, a subsidiary of North American Life Assurance Company of Toronto.

12.    Mr. Logan helped grow the company from 2 to 256 employees.

13.    Mr. Logan served as President of WLA from its inception.

14.    WLA pioneered variable annuity products. Variable annuities provide investors with the flexibility to make various investments with the principal of their annuity with heightened returns through accepted tax deferral benefits.

15.     For the most part, WLA designed the dual investment/tax benefits to help people plan for retirement.

16.     Consistent with his military training, Mr. Logan took a regimented approach to complex problems at WLA like developing new annuity products. In every complex proposal, he put together and worked through a team of lawyers, accountants, and project-specific specialists to test what he knew from his own education and experience.  That multi-level approach served WLA, its employees, and its retirement customers well.

17.     Mr. Logan and WLA regularly relied upon the lawyers at Curtis, Brinckerhoff & Barrett for that firm's legal advice; the CPAs at Messina, Ceci, Archer & Company (now RSM US, LLP) for that firm's accounting, tax, and financial analysis; actuarial firms; and other specialists the proposal required.

18.     While Mr. Logan graduated from law school in 1967 and later obtained a tax degree, he always knew that the man who represents himself has a fool for a client.  He has made a point of not making that mistake.

19.     Like most successful business people, Mr. Logan recognized that he needed to rely on highly qualified, full-time lawyers, accountants, and other professionals he respected on any complex matter, because they spent their lives specializing in their individual areas.

20.    Whenever Mr. Logan and his WLA team developed new investment or annuity products, they would ask their outside attorneys, CPAs, and actuaries to help design the proposal, independently review it with a critical eye, and determine how best to structure it.

21.    When Mr. Logan and WLA needed additional expertise to develop a complex innovative product, he would hire additional professionals with that expertise.

22.    This discipline of relying upon a number of advisers to help complete a new proposal became the standard operating procedure which Mr. Logan brought to WLA as its President.

23.    That greater effort fits squarely with the IRS regulations which recognize the extent of the taxpayer's efforts as the single most important factor in determining reasonable cause that bars penalties.  26 C.F.R. § 1.6664-4(b)(2).

24.    In 1995, North American Security Life Insurance Company and WLA merged to form North American Wood Logan ("NAWL").  Shares of NAWL replaced Mr. Logan's shares of WLA.

25.    In 1996, North American Life Assurance Company merged with Manufacturers Life Insurance Company.  NAWL was restructured as Manufacturers Life Wood Logan.

**B.     Family Succession Planning.**

26.     Mr. Logan's wife of 28 years died of cancer in 1991.  Long term protection of their children and (hopefully) grandchildren fell to Mr. Logan.

27.     Mr. Logan engaged Stephen Lichtstein and Jonathan Gross at Berkowitz, Lichtstein, Kuritsky, Giasullo & Gross to help him with those family estate concerns.

28.     As part of that process, Mr. Logan wanted to establish trusts that would secure his children's future needs, especially the needs of his son who still suffers from multiple sclerosis.

29.     In 1998, Mr. Logan organized SKL Family Partnership ("SKL") as a limited partnership, and transferred 240,000 shares of WLA to SKL.[2]  Mr. Logan retained 53,690 shares of WLA.

30.     At the same time, Mr. Logan created the Logan Trusts, which he managed as trustee.  Through the end of 1999, each of the Logan Trusts owned a 32.9 percent interest in SKL.  Mr. Logan owned the remaining 1.3 percent.

31.     The estate planning by Berkowitz, Lichtstein paralleled the retirement products Mr. Logan and WLA developed by maximizing the amount passing to one's family through minimizing the taxes under the law.

---

[2] Although its name changed over time, we will refer to the business Mr. Logan and his partner built, including all subsequent business combinations, as WLA.

8

**C.    Sale of WLA and Review of Advice.**

32.    In 1999, Manulife Financial Corporation ("Manulife"), the Canadian financial services holding company which owned Manufacturers Life Insurance Company of Toronto and shares of WLA, approached Mr. Logan and his partner with what in effect turned out to be a merger of WLA into Manulife.

33.    On June 1, 1999, Manufacturers Life Insurance Company of Toronto, the subsidiary of Manulife Financial Corporation, acquired the remaining shares of WLA from SKL, Mr. Logan, and Mr. Wood, as well as all WLA employees.

34.    Mr. Logan and the Logan family partnership reinvested roughly two-thirds of the proceeds back into Manulife stock.

35.    While in many respects the sequence resembled a stock swap for most of the proceeds, it was treated as a sale for financial and tax purposes.

36.    As soon as word spread that WLA and its affiliates had been sold to Manulife, Mr. Logan was inundated with investment firms trying to "help" him reinvest the proceeds.

37.    Mr. Logan used the same disciplined approach to view those proposals that he used in evaluating new financial products for WLA.

9

38.     Like variable annuities, like-kind exchanges, tax-exempt bonds, retirement plans, and many other investments, most of the proposals Mr. Logan received offered some combination of investment and tax benefits.

39.     Like the annuities WLA developed, Mr. Logan understood that the overall object was to maximize overall returns through a combination of both tax and investment benefits.

40.     As Mr. Logan was well aware from the WLA annuity business, the Supreme Court has long recognized that anyone may so structure his affairs to minimize taxes and no one bears an obligation to pay a penny more in taxes than the law requires.

41.     That approach mirrored the estate planning where tax considerations allowed Mr. Logan to maximize what would pass to his children.

42.     Neither Mr. Logan nor his team accepted either the investment or tax aspects of the recommendations at face value without investigation.

43.     Mr. Logan focused on the investment aspects and then depended heavily on his team of tax advisors to confirm the accuracy of what he was being told.

44.     At least two of the proposals involved investing through foreign currency options - one in the Japanese Yen and the other in the European Union Euro which had just been issued in early 1999, a rare event in the currency world.

45.     Again consistent with his standard operating procedure, Mr. Logan sought advice from Steven Guterman, the former Managing Director and Head of U.S. Fixed Income Portfolio Management at Salomon Brothers Asset Management upon whom Mr. Logan and WLA had relied to handle the fixed investment side of their insurance and annuity products business.

46.     In particular, Mr. Logan asked Mr. Guterman whether the Yen or the Euro presented the strongest investment potential and whether a bullish view on the Euro made sense.  Mr. Guterman confirmed his own views with others and recommended that Mr. Logan pursue the bullish Euro positions.

47.     Based on that and other advice, Mr. Logan pursued the bullish Euro option trading recommended by Sentinel Advisors ("Sentinel") in New York City (the "Sentinel transactions").

48.     The Sentinel transactions would be handled through AIG, a leading international competitor of Manulife and WLA whose participation gave Mr. Logan confidence in the standing of the participants.

11

49.    Sentinel provided Mr. Logan and his advisors with the impressive credentials of the Sentinel traders and principals, as well as a hard bound book on options trading and materials relating to the types of Euro options Sentinel expected to trade.  Mr. Logan studied those materials.

50.    Some of the options Sentinel recommended consisted of spread options (which offered the opportunity to essentially double the net equity, plus additional profits through restriking) and "Knock-Out" options which offered returns up to 36:1 and a one-in-five opportunity to average a 14:1 return.

51.    Mr. Logan took the same regimented care that he took on behalf of his Company with proposals of this size and scope.  He turned to Derek Gilman and Jim Murphy at Curtis, Brinckerhoff; Donald Polchinski and Tony Ceci at Messina, Ceci; and Stephen Lichtstein and Jonathan Gross at Berkowitz, Lichtstein.  Mr. Logan also drafted WLA's longtime trusted Chief Financial Officer, Frank Devivo, as an additional sounding board.

52.    Mr. Logan specifically asked his long time corporate attorneys, Jim Murphy and Derek Gilman from Curtis, Brinckerhoff, to investigate Sentinel and its proposal.  Mr. Murphy ran Dun and Bradstreet reports and investigated the credentials of the principals at Sentinel.  All of the team reviewed the investment aspects.

53.    Mr. Logan was provided materials on the foreign currency credentials of the principals in Sentinel.

54.    The founder of Sentinel, Ari Bergmann, had headed the derivative desk for Bankers Trust, one of the then ten largest banks.

55.    Mr. Logan personally met with Mr. Bergmann and others at Sentinel, as well as following up through a number of telephone conferences.

56.    Mr. Bergmann and Sentinel stressed that the release of a new currency, especially one representing the consolidation of Western Europe, was a once in a lifetime trading opportunity.

57.    When Mr. Logan was investigating this proposal, Mr. Bergmann and Sentinel were "bullish" on the Euro – that is, they expected the value of the Euro to rise.

58.    They recommended that Mr. Logan and his family trusts invest through options on derivatives that could disportionately profit from small movements in large hedged positions.

59.    On the Euro spread options, Mr. Bergmann and Sentinel told Mr. Logan you can "double your money" if the Euro moves in the bullish direction Mr. Bergmann predicted.

60.    The Euro spread options consisted of buying a call option that bestowed the right to "call"/buy Euros at a stated price, and simultaneously sell a call option at a slightly higher price.  Thus, if the Euro value rose by the execution date, Mr. Logan would buy low and sell high for a profit.

61.    As to the tax aspects, Mr. Logan learned that Curtis, Mallet, Prevost, Colt & Mosle ("Curtis Mallet"), an international law firm headquartered in New York City, and BDO Seidman ("BDO") were among the firms which had thoroughly analyzed the tax consequences of the foreign currency options trading.

62.    Sentinel confirmed that the foreign currency trading offered remarkable profit potential, while BDO and Curtis Mallet confirmed that the trading offered attractive potential tax benefits.  Mr. Logan felt comfortable with Curtis Mallet because of its reputation and because one of his classmates, a Vietnam veteran, had been a member of the firm.

63.    During August 1999, Mr. Logan sought and received advice from William Bricker, Jr. and Eduardo A. Cukier at Curtis Mallet.  Curtis Mallet provided Mr. Logan and his traditional advisors with a draft opinion letter that included an extensive analysis of the potential tax consequences of the proposed trading through a partnership.

14

64.    Again consistent with his standard operating procedure, Mr. Logan asked his tax advisors to independently scrub the Curtis Mallet and BDO analysis to make sure it was correct.  Those advisors included Derek Gillman, Jonathan Gross, and Don Polchinski who studied the authorities cited by Curtis Mallet and BDO and drew their own independent judgments.

65.    The tax treatment was based on, *inter alia*, a Tax Court case that the IRS won, *Helmer v. Commissioner*, T.C. Memo. 1975-180.[3]   As Mr. Logan's advisors confirmed, that case was consistent with a long line of other cases including Supreme Court contingent obligation decisions.

66.    The *Helmer* line of cases held that a sold option constitutes a contingent obligation, does not constitute a fixed liability for tax purposes, and does not alter tax basis.

67.    As the Courts later confirmed, the *Helmer* line of cases constituted the prevailing authority in 1999 and 2000 when Mr. Logan's advisors told him that the *Helmer* line of cases represented prevailing authority *and* at the time Mr. Logan's accountants prepared his 1999 return based on *Helmer*.

---

[3] In *Helmer*, the IRS argued and the Tax Court agreed that the sale of an option constituted a contingent obligation – not a fixed liability taken into account in determining basis.

68.    Each of Mr. Logan's traditional tax advisors agreed that the authorities led to the same conclusions reached by Curtis Mallet and explained to Mr. Logan why they agreed with those conclusions.  Mr. Logan, who had also studied the opinion and memorandum, understood the explanations, agreed with the authorities, and followed his advisors' consistent conclusions.

69.    Based upon the advice received, the Logan Trusts, Sentinel, Banque Safra, and another group formed Tigers Eye to execute the trading strategy advised by Sentinel.

70.    Just as Sentinel predicted, the Euro climbed after Mr. Logan, as trustee, entered the first Euro options and then chose to join Tigers Eye where the knockout options could be traded.  Then, the Euro reversed.  Fixed income experts with whom Mr. Logan consulted saw this reversal as a serious, longer term, negative trend.  As a result of the continuing decline in price through October and November 1999, other political and economic concerns about the Euro, and questions regarding the permanent existence of the European Union, Mr. Logan, as trustee of the Logan Trusts, withdrew from Tigers Eye in December 1999.  Tigers Eye distributed Xerox stock to the Logan Trusts in redemption of their interests.

71.    The Logan Trusts later sold their positions in the Xerox stock.

72.     As required by 26 U.S.C. § 732(b), the basis for the Logan Trusts'
Xerox stock was each of the Logan Trusts' outside basis in their interest in
Tigers Eye. The tax advisors for the Logan Trusts computed their outside basis
in accordance with *Helmer*. The sales resulted in short-term capital losses.

73.     On March 31, 2000, Curtis Mallet issued an opinion to Mr. Logan,
as well as a 122 page memorandum of authorities – including cases Curtis
Mallet won. Curtis Mallet updated that opinion and memorandum.

74.     Tigers Eye timely filed its 1999 Federal income tax return
consistent with the advice it received from various legal and tax advisors.

75.     The Logan Trusts timely filed their 1999 Federal income tax
returns consistent with the advice they received from various advisors,
including the reporting of basis on the sale of their shares of Xerox stock.

76.     As grantor trusts, Mr. Logan reported the trust losses from the sale
of Xerox stock on his 1999 Federal income tax return. *See* 26 U.S.C. § 671.

77.     After the IRS issued a notice that sought to reverse *Helmer* (but
failed to cite it), the tax advisors confirmed that the prevailing authority
remained the law.

78.     On October 10, 2000, Mr. Logan timely filed his 1999 Federal
income tax return consistent with the advice that he received from his advisors.

**D.    The IRS Audits Tigers Eye.**

79.    Well after Mr. Logan entered into the recommended Sentinel trading through Tigers Eye, the IRS issued a notice effectively reversing its position in *Helmer*.  As a result, the IRS audited Tigers Eye beginning in 2002.

80.    During the ensuing audit, Tigers Eye and Mr. Logan, as individual and trustee of the Logan Trusts, cooperated with the Service's investigation.

81.    The IRS made its final determination nearly five years after Tigers Eye filed its original 1999 return by way of a Final Notice of Partnership Administrative Adjustment ("FPAA") dated March 7, 2005.

82.    By that stage, the Court of Federal Claims had held in *Coltec Industries, Inc. v. United States*, 62 Fed. Cl. 716 (2004) that the "economic substance" doctrine did not override the exclusion of contingent obligations from fixed obligations (which impact tax basis).

83.    Also at that stage in 2005, the *Helmer* line of cases remained the prevailing authority on the contingent nature of sold options like the sold Euro options Mr. Logan and his trusts executed prior to entering Tigers Eye and the prevailing authority on such contingent options having no input on tax basis.

18

### E.   Tigers Eye Litigation.

84.    Mr. Logan wanted to confirm – and was entitled to find out – if what he was told about the tax treatment was correct.

85.    He was closely tracking the leading Sentinel Euro options case in the nation, *Jade Trading, LLC v. United States*, which was pending trial in the Court of Federal Claims.

86.    Because Mr. Logan and the Logan Trusts still believed in the advice they received, Mr. Logan, as trustee of the Logan Trust I, filed a Complaint in the United States Court of Federal Claims on August 4, 2005 contesting the IRS's determination.   On the same day, Tigers Eye filed a Petition in the United States Tax Court contesting the IRS' determination.

87.    Given that Tigers Eye filed in the United States Tax Court, Mr. Logan, as trustee of the Logan Trust I, intervened and sought to carry on the Tax Court case.  He voluntarily dismissed the Complaint in the United States Court of Federal Claims.

88.    On July 12, 2006, the Court of Appeals for the Federal Circuit reversed *Coltec* by isolating just the tax aspect – an unprecedented approach that commentators criticized and at least one Court rejected as a result-driven "slice-and-dice." *Coltec*, 454 F.3d 1340 (Fed. Cir. 2006).

19

89. The *Coltec* "slice-and-dice" approach departed from the "whole undertaking" and "the nature of the entire transaction" view required by the Supreme Court in *Gregory v. Helvering*, 293 U.S. 465, 470 (1935) and *Frank Lyon Co. v. United States,* 435 U.S. 561, 583-4 (1978).

90. On December 23, 2007, the Court of Federal Claims then retroactively applied the *Coltec* tax isolation approach to the 1999 lead Sentinel Euro option case, *Jade Trading, LLC v. United States,* 80 Fed. Cl. 11 (2007) ("*Jade Trading I*"), *aff'd*, 598 F.3d 1372 (Fed. Cir. 2010) ("*Jade Trading II*").

91. Still, the Court of Federal Claims recognized in *Jade Trading I* that the *Helmer* line of cases represented the prevailing authority in 1999 and 2000 when Mr. Logan had to make his decision on the Sentinel trading and his advisors had to make their decisions on the tax treatment that should be reported in 2000 on Mr. Logan's 1999 return. Further, that Court relied on the 2006 *Coltec* Federal Circuit opinion as changing the result.

92. Specifically, the Court in *Jade Trading I* said:

> Plaintiffs argue that the sold options assumed by Jade were contingent obligations, not liabilities for purposes of lowering the basis in the Ervin LLCs' partnership interests under section 752(b). In so arguing, Plaintiffs seize upon the construction of section 752 by the Tax Court in *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), which at the time of their transactions was good law.

93.    Despite significant problems that later led to partial reversal in *Jade Trading II*, Mr. Logan decided by 2009 to accept the ruling on the tax merits, pay every penny of those taxes, and pursue his reasonable cause defense at the partner-level.

94.    Consequently, Mr. Logan paid $4,000,000 in 1999 taxes on or about August 6, 2009, and paid another $3,000,000 on or about August 17, 2009.  These payments exceeded the alleged tax deficiency on Mr. Logan's 1999 Return.

95.    In 2010, the Federal Circuit upheld the disallowance of the tax benefits in the leading Sentinel Euro option case (*Jade Trading II*) based on the 2006 *Coltec* isolation of the tax slice – but explicitly confirmed that the *Helmer* line of cases represented the prevailing authority in 1999 and 2000 when Mr. Logan and his advisors had to make their decisions.

96.    On appeal, the Federal Circuit confirmed in *Jade Trading II*:

> A tax loss was anticipated because, at the time of the facts giving rise to this case, an investor's basis in a partnership was ordinarily not decreased by the amount of a contingent liability contributed to or assessed by a partnership. *See Helmer v. Comm'r*, 34 T.C.M. (CCH) 727 (1975) (holding that a contingent obligation, such as an option, was not a liability under § 752 of the Tax Code because a partnership's obligation under the option does not become fixed until the option is exercised).

21

97.    Following comprehensive motions designed to expedite the litigation, the Tax Court issued an opinion which Mr. Logan believed violated controlling precedent. *Tigers Eye Trading, LLC v. Commissioner*, 138 T.C. 67, 192 (2012) (Holmes, J. dissenting) ("Of all the routines in judicial gymnastics, few have a higher degree of difficulty than the reverse benchslap, and we're trying for a combination double with our opinion today.")

98.    Mr. Logan appealed the Tax Court's erroneous decision to the D.C. Circuit Court of Appeals to confirm the jurisdictional and penalty issues. The D.C. Circuit held the appeal in abeyance until the Supreme Court could decide a related issue in *United States v. Woods*, 571 U.S. __, 134 S. Ct. 557 (2013). In 2013 (nearly nine years after Tigers Eye filed its original case), the Supreme Court finally settled the jurisdictional and partnership penalty issues incorrectly determined by the Tax Court.

99.    Both the Department of Justice at oral argument and the Court of Appeals for the D.C. Circuit confirmed that nothing at the partnership level altered Mr. Logan's reasonable cause defense to the penalties at the partner-level in this proceeding.

## V.  COUNT ONE - SUIT FOR REFUND

100.   The foregoing facts, which are incorporated herein as if restated in full, establish that no penalty, either the 40 percent gross valuation misstatement penalty or any of the 20 percent accuracy-related penalties, should apply to Mr. Logan.

101.   As detailed below, the Court should grant the relief sought in this action for three distinct reasons, each of which is sufficient on its own merit to require a refund of all penalties and penalty interest for tax year 1999 (plus interest on the refund total as provided by law).

102.   Because of the violation of procedures, Mr. Logan overpaid penalties by $2,465,847.40, plus statutory interest.

103.   The attached claim for refund summarizes and annotates the most important facts that support Mr. Logan's refund claim and those facts are incorporated by reference. *See* Exhibit 1.

### One – Mr. Logan's Reasonable Cause Requires Refunds of Penalties and Penalty Interest.

104.   Mr. Logan, as an individual and as trustee of the Logan Trusts, diligently consulted with his various advisers to determine whether the trading Sentinel encouraged would create long-term profits for him and his family and help diversify their earnings following his retirement.

105.   More importantly, Mr. Logan, as individual and as trustee of the Logan Trusts, sought and received advice about the tax aspects of the transaction from a respected New York law firm, a national accounting firm, his long-time CPA firm, WLA's long-time corporate transactional firm, and his long-time estate and tax planning firm.

106.   Mr. Logan and the Logan Trusts' advisors were more than competent during 1999 when Mr. Logan and the Logan Trusts entered into the transaction and during 2000 when Tigers Eye, the Logan Trusts, and Mr. Logan reported the tax consequences of the transaction.

107.   Mr. Logan and the Logan Trusts provided their advisors with all the information they had so the advisors could make an informed decision.

108.   Just as he did with complex WLA matters, Mr. Logan and the Logan Trusts received advice from their trusted team of advisors and followed it in good faith.

109.   Mr. Logan and the Logan Trusts had reasonable cause for taking the disputed positions on their returns and acted in good faith.

110.   All payments of penalties and penalty interest should be refunded with statutory interest.

## Two – Penalties Cannot Be Imposed Retroactively Based on Changes in the Rules After the Game is Over.

111.   Mr. Logan and the Logan Trusts' reasonable cause defense must be evaluated based on the knowledge and case law that existed at the time they entered into the transaction.

112.   At the time they entered into the transaction, the law on contingent obligations remained clear.

113.   Mr. Logan and the Logan Trusts' team of advisors relied on a variety of case law, including a case that the IRS won, *Helmer*, to determine that the Logan Trusts properly reported basis in the Xerox stock on their 1999 Federal income tax returns.

114.   Case law confirms that Courts changed that tax treatment years after Mr. Logan and the Logan Trusts entered into the Sentinel transactions in 1999 and when they reported them on their returns in 2000.

115.   As a matter of fundamental fairness, penalties should not be imposed for following controlling law, later changed by the Courts, at the time Mr. Logan and the Logan Trusts entered into and reported the transactions.

116.   All payments of penalties and penalty interest should be refunded with statutory interest.

### Three – No Valuation or Basis Overstatement Justifies the Imposition of Penalties at the Partnership Level

117.    The Tigers Eye decision documents indicate that "a 40 percent gross valuation misstatement penalty under I.R.C. § 6662(a), (b)(3), (e), and (h) applies to any underpayment of tax that relates to the partnership item adjustments set forth in the above-referenced FPAA, and that is attributable to gross valuation misstatement (such as the overstatement of value of capital contributions), subject to partner-level defenses."

118.    The FPAA did not determine the Logan Trusts' basis in the Xerox stock that they sold as the Xerox stock remained a partner-level item.

119.    Tigers Eye did not sell Xerox stock.

120.    Instead, the Logan Trusts sold Xerox stock.

121.    The gross valuation misstatement penalty requires a comparison between the correct adjusted basis of the Logan Trusts' Xerox stock versus the reported adjusted basis of the Xerox stock.  26 U.S.C. §§ 6662(e), (h).

122.    A determination of the Logan Trusts adjusted basis in the Xerox stock that they sold requires partner-level determinations, either through a Notice of Computational Adjustment or a Notice of Deficiency.

123.    The Notice of Computational Adjustment only asserted penalties of $9,249.

26

124. The Notice of Deficiency erroneously asserted $2,456,598.40 of alleged gross valuation misstatement penalties.

125. However, the Tax Court confirmed that the Notice of Deficiency remained invalid.

126. As the valuation penalty could only apply to the Logan Trusts' sale of Xerox stock, the FPAA and Notice of Deficiency did not provide grounds for gross valuation penalties against Mr. Logan and the Logan Trusts.

127. Thus, any penalties asserted in the Notice of Deficiency remain invalid, excessive, and erroneous and the amounts paid as a result of the Notice of Deficiency must be refunded with statutory interest.

## VI. **REQUEST FOR RELIEF**

Plaintiff asks this Court to order refunds of penalties and penalty interest as set forth in Part V, with statutory interest on the total. Plaintiff demands a jury trial on all issues triable by jury.

February 13, 2018

Respectfully submitted,

/s/ John Agnew
JOHN AGNEW
*Trial Counsel*
Florida Bar No. 27377
Henderson, Franklin, Starnes & Holt, P.A.
1715 Monroe Street
Fort Myers, Florida 33901
Telephone:  (239)-344-1364
Facsimile:  (239-344-1538
E-mail: john.agnew@henlaw.com

/s/ David D. Aughtry
DAVID D. AUGHTRY
*Pro Hac Vice Pending*
Georgia Bar No. 028010
E-mail: david.aughtry@chamberlainlaw.com

/s/ John W. Hackney
JOHN W. HACKNEY
*Pro Hac Vice Pending*
Georgia Bar No. 420954
E-mail: john.hackney@chamberlainlaw.com
Chamberlain, Hrdlicka, White,
  Williams & Aughtry
191 Peachtree Street, N.E., 46th Floor
Atlanta, Georgia 30303
Telephone:  (404) 659-1410
Facsimile:  (404) 659-1852

Counsel for Plaintiff

2674290.v27

28